UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

                Plaintiff,

        v.                                Case No.  11-C-0755

STIFEL, NICOLAUS & CO., INC. and
DAVID W. NOACK,

                Defendant.

ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS TO DISMISS (DOCS. 15, 16)

      The Securities and Exchange Commission sues Stifel, Nicolaus & Co., Inc. and its former Senior Vice President, David W. Noack, for alleged violations of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 in connection with the sale of collateralized debt obligations to five eastern Wisconsin school districts.  In addition, the SEC asserts that Stifel violated Section 15(c)(1)(A) of the Exchange Act and that Noack aided and abetted that violation.  The defendants move to dismiss under Fed. R. Civ. P. 9 and 12(b)(6).[1]

      A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  The complaint has to contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  However, enough facts must be set forth to state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570,

---

[1]The defendants filed their motions to dismiss separately, but Noack adopted Stifel's briefs and arguments, so the motions are treated together as one.

127 S. Ct. 1955, 1974 (2007); *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atl.*, 550 U.S. at 555-56, 569 n.14). When considering a Rule 12(b)(6) motion, the court is to construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Federal Rule of Civil Procedure 12(e) allows a party to move for a more definite statement before filing an answer if the complaint "is so vague or ambiguous that the party cannot reasonably prepare a response." The motion must point out the defects complained of and the details desired. Fed. R. Civ. P. 12(e). A Rule 12(e) motion is disfavored and is not a substitute for discovery. *Coleman v. Majestic Star Casino, LLC*, No. 2:11-CV-391-PPS-PRC, 2012 WL 1424396, *1 (N.D. Ind. Apr. 24, 2012). However, it may be used to put a defendant on notice regarding which claims apply to what parties. *Id.*

Here, defendants attack the Complaint on procedural and substantive grounds.

PLEADING WITH PARTICULARITY UNDER RULE 9

The allegations in the Complaint concern fraud and thus must satisfy special pleading requirements. The SEC acknowledges the pleading standard of Fed. R. Civ. P. 9(b), which means that it must "state with particularity the circumstances constituting fraud."

To set forth the circumstances of fraud with particularity, the plaintiff must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to

2

the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation marks omitted). Put another way, a complaint has to identify "the 'who, what, when, where, and how' of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011). However, courts and litigants should not take an overly rigid view of the dictates of Rule 9(b). *See id.* at 442. "The purposes of the pleading requirement are to protect a defending party's reputation from harm, to minimize strike suits, and to provide detailed notice of a fraud claim to a defending party," 2 James William Moore, *Moore's Federal Practice* § 9.03[1][a], at 9-15 (3d ed. 2012) (footnotes omitted), and "to force the plaintiff to do more than the usual investigation before filing his complaint," *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

Defendants contend that certain allegations of fraud must be dismissed, struck from the Complaint, or repleaded or supplemented with a more definite statement because they fail to meet Rule 9(b) requirements through lack of precise dating and failure to identify the specific individuals to whom statements were made.

A. Specificity as to the Date Statements Were Made

Defendants argue that the contentions in paragraphs 73, 75, 79, 81, 87, 89, 91, 93, 95, and 103 of the Complaint suffer from a failure to identify when fraudulent statements may have been made. Defendants note that they need the dates to determine, for instance, whether such statements were made while Noack worked at Stifel and whether such statements were made before or after the first, second, or third transactions at issue. (Doc. 17 at 7-8.)

3

The SEC responds that the Complaint asserts, among other things, that the misrepresentations occurred before school districts invested in 2006 and that Noack was acting on behalf of Stifel at the time he made the statements. (*See* Doc. 20 at 8.) The SEC points to paragraphs that set forth specific dates for other statements (such as in Doc. 1 ¶¶ 77, 83) as support for the time frame of 2006. In addition, the Complaint charges that Noack worked for Stifel from 2000 to 2007. (Doc. 20 at 8 (citing Doc. 1 ¶¶ 17, 71).)

Plaintiffs are not absolutely required to plead specific dates of fraudulent acts "provided they use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." 2 Moore, *supra*, § 9.03[1][b], at 9-18, *cited in Pirelli Armstrong Tire Co.*, 631 F.3d at 442. But here, as to the paragraphs challenged by defendants, the SEC has failed to provide any precision regarding a date or a sufficiently narrow time frame to satisfy Rule 9(b). "Sometime in 2006 or before" or "sometime before one of the three transactions" are too imprecise for Rule 9(b) purposes.

Thus, defendants' motions to dismiss or strike the claims in the following paragraphs are granted. However, the SEC will be allowed to amend the Complaint if it believes that it can set forth more specific dating for these statements.

4

| Compl. ¶ | Allegation | Sufficient re Date? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis-West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | No. "[B]efore the first deal" is not sufficiently precise to satisfy Rule 9(b) regarding statements to West Allis-West Milwaukee. Further, from other documents in the record it appears that Waukesha was not part of the "first deal" with West Allis-West Milwaukee, drawing into question whether the statement occurred prior to the first of the three transactions or the first transaction involving West Allis-West Milwaukee. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | No. No specificity, precision, or time frame; likely sometime before one of the three transactions but that is not specific enough. |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. The second transaction occurred on September 29, 2006. Even if the SEC limited this to the year 2006, "before the second deal" leaves many months, which is too imprecise to satisfy Rule 9(b) in this case. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |

5

| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
|---|---|---|
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis-West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | No. No time frame is given nor any other means of determining the date with relative precision. |
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | No. No time frame is given nor any other means of determining the date with relative precision. |

B.     Specificity as to Whom the Statements Were Made

Next, defendants argue that the requirement regarding identification of the "who" of

an allegedly fraudulent statement includes identification of "to whom" each statement was

made, citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), and *Roberts v.*

6

*McCarthy*, 2:11-CV-00080, 2011 WL 1363811, *3 (D. Nev. Apr. 11, 2011). According to defendants, the allegations in paragraphs 73, 75, 77, 79, 81, 83, 85, 87, 89, 91, 93, 95, 97, 99, and 103 do not satisfy Rule 9(b) pleading requirements because they do not adequately specify to whom the statements were made. While some of these statements are identified as having been made to the "School Districts," those claims fall short; defendants are not provided with the names of the *individuals* to whom the statements were made.

*DiLeo* does not discuss expressly a requirement of identifying the *recipient* of a fraudulent statement. However, the case sets forth the oft-quoted phrase that Rule 9(b) requires "the who, what, when, where, and how: the first paragraph of any newspaper story." 901 F.2d at 627. But the court did not add that "who" means identification of both the speaker and the listener. *See id.* Similarly, *Roberts* does not address whether the plaintiff must identify the person to whom a statement is made, although in a parenthetical it cites another case for the proposition that identification of the listener is required when the alleged fraud is that of a corporation. Nevertheless, Moore's Federal Practice suggests that Rule 9(b) often requires allegations regarding "[t]he persons or entities to whom the misrepresentation was communicated." 2 Moore, *supra*, § 9.03[b], at 9-18. But notably, even Moore's indicates that identification of the *entity* to whom the statement was made (not an individual at the entity) is acceptable.

Here, in large part, the SEC's allegations of "who" are sufficient. Who *made* the statement is generally more important than who *heard* it, *cf. Vicom, Inc.*, 20 F.3d at 777 (stating that because fair notice is the most basic consideration underlying Rule 9(b) a fraud pleading must reasonably notify the defendant of his role in the fraud), and the SEC

7

identifies the speaker as Noack for all statements. Plus, for many challenged statements the SEC identifies at least one school district to whom a statement was aimed.

Though defendants submit that the Complaint should name the individual at the school district who heard alleged misrepresentations, the absence of these names may be a matter for discovery rather than a basis for dismissal or striking portions of the Complaint. Here, the allegations naming a particular school district are sufficient. Moreover, assertions in the Complaint identify the individuals to whom misrepresentations were made as school board members, providing even more detail to the defendants.

In addition, for allegations naming the "School Districts" together as the listeners, the Complaint defines the term "School Districts" as five particular school districts in the State of Wisconsin: School District of West Allis-West Milwaukee, Kenosha School District No. 1, School District of Waukesha, Kimberly Area School District, and School District of Whitefish Bay. (Doc. ¶¶ 1, 18.) Thus, if allegations indicate that a statement was made to the "School Districts," the Complaint is read as a whole to indicate that the statement was made to all five school districts, and that is sufficient as well.[2]

However, in certain instances the Complaint asserts that a statement was made to "possible others." Such a reference is too vague to satisfy Rule 9(b). Additionally, some paragraphs assert a statement by Noack in general, followed by examples of the statement being made to a particular school district. Only the examples are sufficiently pled under Rule 9(b) unless the general statement is accompanied by other precise facts that describe

---

[2]Of course, when repleading dates the SEC will need to identify the date the statement was made to each of the five school districts.

it more particularly, such as where and when the statement occurred or that it was indeed made to all five school districts.

The SEC submits that when the Complaint is analyzed, it should be understood that statements not specifying a particular school district as recipient were made to all five school districts unless otherwise noted. But here, that is not acceptable. This case is not one in which the listener or recipient discussed in a complaint may be identified easily. Five school districts are involved. Moreover, the Complaint includes over 200 paragraphs of allegations. Hence, this case warrants particularity, not just assumptions that certain statements were made to all five school districts.

In short, the identification of a school district as the recipient of a fraudulent statement is acceptable even if an individual at the school district is not named. But in this case, with five different school districts involved, the SEC needs to identify at the least which school districts heard the statements.

Thus, the rulings as to each challenged statement are as follows:

| Compl. ¶ | Allegation | Sufficient re "to Whom"? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis-West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | Yes as to the statement made to West Allis-West Milwaukee and the separate statement made to Waukesha. No as to the first sentence of the paragraph to the extent it may have been made to others. |

9

| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | Yes as to the statement made to Waukesha. No as to "possible others." |
|---|---|---|
| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way – the real – you need 15 Enrons. You need something to happen that big overnight.' The audio was recorded." | Yes as to the statement made to Whitefish Bay. No as to the first sentence of the paragraph to the extent the statement may have been made to others. |
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | Yes. The allegation is that the statement was made to all five school districts. No as to the first sentence of the paragraph to the extent it may have been made to others. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | Yes as to the statement made to Kimberly. No as to "possible others." |
| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West Allis-West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | Yes. |

10

| 85 | "Noack represented that the third deal would involve an investment in only investment-grade companies. During a meeting of the school board of Waukesha on November 27, 2006, which was videotaped, Noack stated to the school board: '[A]gain, we're only investing in higher grade companies. If you look at the balance sheets of investment grade companies in the world today, which is 805, they're doing better than ever.' Noack later said at that same meeting: '[T]he odds of, again, it takes twenty out of these hundred companies to default before it gets to your AA level.'" | Yes as to the statement to Waukesha. Moreover, all Waukesha school board members present at the meeting can be assumed to have heard the statements, providing even the level of specificity that defendants argue for. No as to the first sentence to the extent it may relate to other school districts. |
|---|---|---|
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | Yes as to the statement made to Kenosha. No as to "possible others." |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | Yes as to the statement made to Kenosha. No as to "possible others." |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Yes as to the statement made to Waukesha. No as to "possible others." |
| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis-West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | Yes as to the first statement as made to West Allis-West Milwaukee. No as to the second statement, as it does not indicate that it was made to all four other school districts—"other School Districts" is vague as to whether it is all four or just some of them. |

11

| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | Yes as to the statement made to Whitefish Bay and Kimberly. No as to "possible others." |
|---|---|---|
| 97 | "Noack misrepresented the initial performance of the first investment. On or about August 14, 2006, Noack attended a West Allis-West Milwaukee school board meeting to propose an additional investment in the GOAL Program. A school board member asked Noack how the first investment was performing. Noack responded that the investment was 'on course.'" | Yes as to statement made to West Allis-West Milwaukee. No as to the first sentence to the extent it may have been made to anyone else. |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis-West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?'" | Yes. Moreover, all Whitefish Bay school board members can be assumed to have heard or seen the statement, providing even the level of specificity that defendants argue for. |
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | Yes. Use of the defined term "School Districts" indicates that the statements were allegedly made to all five school districts. |

## SUBSTANTIVE CHALLENGES

The SEC does not disagree that its claims require that an alleged misrepresentation or omission be material. *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (stating that violations of § 10(b), § 17(a)(1)-(3), and Rule 10b-5 require a material misrepresentation or material omission as to which the individual had a duty to speak).

12

A misrepresentation is material if there is a substantial likelihood that the statement or omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information" and is a fact-specific inquiry. *Id.* at 240.

Defendants contend that various alleged misrepresentations, even if pled properly, were immaterial as a matter of law because they were (1) puffery; (2) opinion, including predictions of future performance and generic statements about risk; or (3) as to West Allis-West Milwaukee contradicted by written offering documents. Thus, no reasonable investor would have considered the information significant.

In addition, defendants contend that certain allegations of omission must be dismissed because defendants had no duty to disclose the allegedly omitted information.

A.      Puffery

"Mere sales puffery is not actionable under Rule 10b-5," *Eisenstadt v. Centel Corp.*, 113 *F.3d 738*, 745-46 (7th Cir. 1997), because it is not material. Typically, puffery involves optimistic rhetoric and promotional sales talk that is devoid of substantive information and contains no useful information upon which a reasonable investor would base a decision to invest. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004). It includes "general, optimistic statements that are not capable of being objectively verified." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d at 1164. "[L]oosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no

13

reasonable investor could find them important to the total mix of information available," may be found immaterial as a matter of law and a basis for granting a motion to dismiss. *Id.* (internal quotation marks omitted).

Defendants maintain that the statements in paragraphs 73, 75, 77, 79, 81, 83, 85, 89, 91, 93, 95, 97, 99, and 103 of the Complaint are immaterial and nonactionable puffery. They argue that phrases like "'treasury-like, 'higher-grade,' 'bread lines,' 'financial trouble,' 'on course,' and 'hiccup' all exemplify a lack of precision such that a reasonable investor could not find the information to be material. There is no way to define these phrases, and no way to quantify them." (Doc. 17 at 10.) Defendants further assert that such phrases were merely optimistic rhetoric. (*Id.* at 12.)

However, defendants pull those words out of the sentences that give them context and help determine their substantive meaning. Moreover, for the reasons set forth below the court finds that, with one exception, the challenged allegations are more than puffery. As for the one exception, the court agrees that the alleged statement regarding bread lines is hyperbole and too vague for a reasonable investor to rely upon it. Therefore, the motion to dismiss will be granted as to that one allegation (paragraph 91) and it is dismissed as a matter of law.

| Compl. ¶ | Allegation | Puffery? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis-West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment.  Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | No.  Treasury bonds are generally believed by the public to be very low-risk investments.  *See, e.g.*, Treasury Bills, Notes and Bonds Have Risk, Too, www.usatoday.com/money/perfi/columnist/krantz/2007-08-24-treasury-risk_N.htm (viewed Aug. 28, 2012) ("When you lend money to the government by buying a Treasury bill, note or bond, you're getting an investment backed by the full faith and credit of the U.S. government. In other words, you'll get your interest and principal back unless the U.S. government fails."); What You Should Know/Risks of Investing in Bonds, www.investinginbonds.com/learnmore.asp?catid=38id=383 (viewed Aug. 28, 2012) ("It's All Relative to 'Riskless' Treasury Yields:  Bonds issued by the U.S. Treasury are backed by the full faith and credit of the U.S. government and therefore considered to have no credit risk.").  Comparison to Treasury bonds conveys substantive, useful information that a reasonable investor would consider in the total mix when deciding whether to invest. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | No.  Noack was providing a meaningful computation to describe the safety of the investor's principal.  The statement can be considered one of substantive, useful information that a reasonable investor would consider.   The preciseness of the statement adds to its usefulness to the investor, suggesting that Noack looked at the 105 companies in the portfolio to make this assessment. |

15

| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way – the real – you need 15 Enrons. You need something to happen that big overnight.' The audio was recorded." | No. Taken in context of the entire paragraph, "15 Enrons" relates to "15 defaults" before Whitefish Bay would lose money on the investment. Moreover, taken in context with the rest of the paragraph, references to Enron could relate to how Enron was managed, and Noack's statement that "we have somebody watching over every company" suggested that managers of the investments at issue would take measures to prevent defaults from such companies from affecting the investment. A reasonable investor could see this as substantive, useful information in the total mix for decision making. |
|---|---|---|
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. Again, Noack was providing a meaningful computation to describe the safety of the investor's principal. The statement can be considered one of substantive, useful information that a reasonable investor would consider. Again, the preciseness of the statement adds to its usefulness to the investor, suggesting that Noack had actual data from which he made the remark. Noack did not refer to "10 times" or "100 times" or some rounded number that suggests vagueness or opinion, but instead used "8.5 times," suggesting that his comment was *not* puffery. |
| 81 | "Noack represented that there had not been a default since Enron in 2000. For example, he made that representation to Kimberly, among possible others." | No. A reasonable investor could consider this comment to have been backed up by actual data—Noack had an actual year and named the defaulting company. A reasonable person would find the length of time from the last prior default to the time of investment to be substantive, useful information to consider in the total mix of information relied upon in making an investment. |

16

| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West Allis-West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | No. Regardless of whether "hiccup" alone could be vague, it was not vague in context of this sentence. Taken in a light favorable to plaintiff, Noack was representing that another school district had completed two deals and that if circumstances following either had caused any meaningful question about the investments he would suggest more time or consideration before additional investments. A reasonable person would find this to be substantive, useful information in determining whether to invest in a similar investment to those made previously by the other districts. |
|----|----|----|
| 85 | "Noack represented that the third deal would involve an investment in only investment-grade companies. During a meeting of the school board of Waukesha on November 27, 2006, which was videotaped, Noack stated to the school board: '[A]gain, we're only investing in higher grade companies. If you look at the balance sheets of investment grade companies in the world today, which is 805, they're doing better than ever.' Noack later said at that same meeting: '[T]he odds of, again, it takes twenty out of these hundred companies to default before it gets to your AA level.'" | No. The statement regarding twenty defaults is similar to the thirty or fifteen defaults discussed above and is actionable. While "higher grade companies" could be considered vague in isolation, it is not vague in context, as Noack's fuller statement related or compared the "higher grade companies" to 805 "investment grade companies," which he suggested were performing well. Taken in plaintiff's favor, the "higher grade companies" are or are similar to 805 identifiable investment-grade companies. A reasonable investor would find this useful information in determining whether to invest. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | No. Again, Noack was providing a meaningful computation to describe the safety of the investor's principal. The statement can be considered one of substantive, useful information that a reasonable investor would consider. |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Yes. The statement is one of hyperbole and sales talk, devoid of real substance and one on which a reasonable investor would not rely for investment decision making. |

Case 2:11-cv-00755-CNC   Filed 09/14/12   Page 17 of 27   Document 28

| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis-West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | No. The statement that the school districts would not lose their principal and would get it back in seven years was precise, useful information on which a reasonable investor would rely. It reflected the safety of the investments as well as the time frame for recovery of principal. The comment about a financial situation as bad as or worse than the Great Depression is also substantive enough to be actionable. The economic conditions of the Great Depression have been documented such that a reasonable investor could use a comparison with that era in assessing risk to the proposed investment. |
|---|---|---|
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | No. This was a precise, not vague, statement about the ability of the portfolio manager to replace the contents of the portfolio. In addition, it indicated that the portfolio manager was monitoring the performance of the credit in the portfolio. This was substantive, useful information for a reasonable investor to consider in the total mix. |
| 97 | "Noack misrepresented the initial performance of the first investment. On or about August 14, 2006, Noack attended a West Allis-West Milwaukee school board meeting to propose an additional investment in the GOAL Program. A school board member asked Noack how the first investment was performing. Noack responded that the investment was 'on course.'" | No. While "on course" in isolation could be vague, it must be considered in context as a response to the question about how the prior investment was performing for purposes of considering a second investment. "On course" could reasonably be interpreted to mean "as anticipated" or "as expected." Taken in context, a different response might have suggested more time or consideration before additional investments, whereas "on course" suggested that the performance of the first investment caused no concern regarding a second investment. A reasonable person would find this to be substantive, useful information in determining whether to invest in an investment similar to that made previously. |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis-West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?'" | No. See the discussion regarding paragraphs 83 and 97. |

18

| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | No. See the discussion regarding paragraphs 75 and 77. |
|-----|---|---|

B.     Forward-Looking Opinion

Defendants contend that some of the alleged misrepresentations are mere opinions or forecasts that are not actionable in the face of written disclosures that "bespeak caution." (Doc. 17 at 17.) According to defendants, written disclosures given to the school districts included cautionary statements, and as a matter of law the school districts could not rely upon projections about the future that could not be verified.

The court disagrees. First, the written disclosures, except for those involving West Allis, are not in the record. Thus, accepting defendants' argument would require outside evidence, which is not proper on a motion to dismiss or in the record before the court. Second, the court disagrees that the following statements are mere opinion or unverifiable forecasts.

| Compl. ¶ | Allegation | Forward Looking Opinion? |
|---|---|---|
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. This statement involves historical default levels, not a projection of what future default levels would be. The comment that it would require 8.5 times the historical default levels for a loss of money involves a measurement of the investment against past standards. It was not a projection of whether future default levels would be higher or lower than historical levels. |
| 83 | "Noack represented to Whitefish Bay during a meeting on November 15, 2006 that West Allis-West Milwaukee had already done two deals, and 'if there is a hiccup in one of the investments, we would slow down.' The audio was recorded." | No. Taken in the light most favorable to plaintiff, Noack was not predicting whether a "hiccup" would or could occur. Instead, he was assuring Whitefish Bay that he and Stifel would not push another investment if something was awry in the previous one of West Allis-West Milwaukee. Noack's assurances about his own and Stifel's conduct is different from an unverifiable prediction about whether a hiccup would or could occur. |
| 95 | "Noack represented that if any of the highly-rated portfolio credits struggled, the portfolio manager would simply replace that credit with another stronger credit to maintain the AA rating. For example, he made that representation to Whitefish Bay and to Kimberly, among possible others." | No. In addition to any prediction as to what the portfolio manager *would* do, this was a representation of what the portfolio manager *could* do. Taking the facts in plaintiff's favor, the abilities of the portfolio manager (i.e., whether he or she had the authority to replace credit in the portfolio) should be verifiable. Moreover, the statement suggests that replacement would have no negative effect, which should be verifiable. |
| 99 | "On November 15, 2006, Stifel and Noack told Whitefish Bay's school board that they had completed two deals already with West Allis-West Milwaukee. He stated: 'So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?'" | No. See discussion of paragraph 83. |

C.    West Allis-West Milwaukee Offering Documents

When an allegedly inaccurate, oral statement is contradicted by an accurate, written

statement, the written statement controls, rendering the oral statement immaterial and not

actionable. *See Carr v. CIGNA Sec. Inc.*, 95 F.3d 544, 547 (7th Cir. 1996); *Assocs. in*

*Adolescent Psychiatry v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir. 1991) ("Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements."). An investor who knew the truth should not be permitted to say that an inconsistent oral statement significantly altered the total mix of information considered in investing. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir. 1988). Moreover, "securities laws are designed to encourage the complete and careful written presentation of material information. A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires." *Id.*

However, the issuer must disclose the truth clearly before a lie becomes immaterial. *Pommer v. Medtest Corp.*, 961 F.2d 620, 624-25 (7th Cir. 1992) The contradiction must be on point: a conflict between "X" and "not-X," such as the difference between a written document saying "this is a risky investment" and an oral statement by the person handing out the document that "this is a safe investment." *See Carr*, 95 F.3d at 547. Documents trump oral statements only when they unambiguously cover the same point. *See Assocs. in Adolescent Psychiatry, S.C.*, 941 F.2d at 571. And obscurity of the written statement in a lengthy document may be considered. *See Acme Propane, Inc.*, 844 F.2d at 1323 ("A three-page Reserve Estimate is not so long that such a statement is too obscure to find.").

Defendants contend that the written offering documents relating to the first West Allis-West Milwaukee transaction contained express written disclosures such that any contrary oral misrepresentation cannot be actionable. Notably, defendants include with their motion the ninety-three page Tribune Limited $10,000,000,000 Secured Note Programme, and the 143-page Tribune Limited Supplemental Programme Memorandum,

21

which they say were given to West Allis-West Milwaukee. (*See* Doc. 17 Ex. A.) Moreover, defendants contend that the alleged misrepresentations in paragraphs 73, 75, 77, 79, 87, 89, 91, 93, and 103 are not material because:

• The initial prospectus stated that the investment "involves substantial risks" and warned that "[e]ach prospective investor should ensure that it fully understands the nature of the transaction into which it is entering and the nature and extent of its exposure to the risk of loss of all or a substantial part of its investment." (Doc. 17 Ex. A at 6.)

• The initial prospectus provided that "[n]o person has been authorised to give any information or to make any representation other than those contained in this Programme Memorandum and/or in the relevant Supplemental Programme Memorandum." (*Id.* at 3 (emphasis deleted).)

• The supplemental prospectus said that "[p]urchasers of Notes should conduct such independent investigation and analysis regarding the issuer, the Notes, the Swap Counterparty, the Investment Advisor . . . as they deem appropriate to evaluate the merits and risks of an investment in the Notes" (*id.* at 95), warned of "clear and substantial risks inherent in investing in or holding the Notes" (*id.* at 95), stated that the investor would be "exposed to the credit risk" of certain corporations and obligations (*id.* at 95-96), and noted that every substitution to the portfolio "may result in an increased risk" of defaults (*id.* at 96).

Documents submitted with a motion to dismiss may be considered part of the pleadings if they are "referred to in the plaintiff's complaint and are central to his claim." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (internal quotation marks

22

omitted); *see also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). When a plaintiff has referred to a document submitted by a defendant with its motion to dismiss, a court may consider the document rather than having to convert the motion to one under Fed. R. Civ. P. 56; the exception prevents parties from surviving a motion to dismiss by artful pleading or by simply failing to attach relevant documents. *188 LLC*, 300 F.3d at 735

The SEC does not object to consideration of documents on file regarding the motion to dismiss. Instead, it defends its case based on the merits.

The court agrees with the SEC's position as follows.

| Compl. ¶ | Allegation | Contrary to Written Disclosure? |
|---|---|---|
| 73 | "Noack represented that the CDO investments were "Treasury-like," and he claimed that they were virtually risk-free. For example, before the first deal, Noack told West Allis-West Milwaukee to think of these investments like Treasury bonds due to the quality of the companies in the portfolio. He represented that only Treasury securities would be a safer investment. Similarly, Noack represented to Waukesha that the CDO investments were similar to Treasury securities because the portfolio was comprised of AAA and AA corporate debt." | No. Although the written disclosures warned of risks generally, they did not compare the investment to the level of risk of Treasuries. |
| 75 | "Noack represented that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose their principal. For example, Noack made that representation to Waukesha, among possible others." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to default before the loss of principal occurred. |

23

| 77 | "Noack represented that it would take '15 Enrons' for the School Districts to lose money. For example, at a meeting of the school board of Whitefish Bay on November 15, 2006, Noack stated: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way – the real – you need 15 Enrons. You need something to happen that big overnight.' The audio was recorded." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk, such as by comparing the level of defaults to the failure of Enron for purposes of when the school districts may start to lose principal. |
|---|---|---|
| 79 | "Noack represented that it would take 8.5 times historically normal default levels for the School Districts to lose money, which only happened during the Great Depression. For example, Noack made that representation to the School Districts before the second deal." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk with any calculation using historical default data. The precise number stated is not contradicted by the written disclosure. |
| 87 | "Noack represented that there was a short-term mark-to-market risk, but that it was not a long-term risk because the School Districts would still get their money back after seven years. For example, he made that representation to Kenosha, among possible others." | No. Although the written disclosures warned of risks generally, they did not contradict that the investor would get principal back after seven years or discuss the difference between a short-term and long-term risk. |
| 89 | "Noack represented that, of the top 800 companies in the world, 100 of them would have to go under before the School Districts would suffer any principal loss. For example, he made that representation to Kenosha, among possible others." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to fail before the loss of principal occurred. |
| 91 | "Noack represented that, if the investments failed, they would all be in bread lines together. For example, he made that representation to Waukesha, among possible others." | Previously dismissed on other grounds. |

24

| 93 | "Noack represented that the country would have to fall further into financial trouble than the Great Depression before the investments would be affected. But even in that scenario, according to Noack, the School Districts would get their principal back after seven years and did not have to worry about losing principal. For example, he made that representation to West Allis-West Milwaukee. He similarly told other School Districts that it would take a Great Depression for the investments to fail." | No. Although the written disclosures warned of risks generally, they did not contradict that the investor would get principal back after seven years or discuss or compare the risk of losing principal to conditions like the Great Depression. |
|---|---|---|
| 103 | "In an affidavit executed in 2008, Noack admitted under oath that he had made statements and representations to the School Districts to persuade them to enter into the CDO transactions. He stated under oath that he had no reason to dispute that he had made statements to the School Districts such as "[i]t takes 20 out of these 100 companies to default before it gets to your AA level," and "[t]here would need to be '15 Enrons' before you would be impacted," and others like them. Noack further admitted that certain of his statements to the School Districts were inaccurate." | No. Although the written disclosures warned of risks generally, they did not quantify the amount of risk regarding how many companies would need to default before the loss of principal occurred or compare the level of defaults to the failure of Enron regarding when the school districts may start to lose principal. |

D.    Omissions

Generally, silence is not actionable absent a duty to speak. *See Chiarella v. United States*, 445 U.S. 222, 232 (1980). A duty to speak may arise from a relationship between parties, *id.* at 228, 232, or from a duty to speak the whole truth when certain statements are made, *see* 15 U.S.C. §§ 78j(b), 77q(a)(2); 17 C.F.R. § 240.10b-5. For instance, Rule 10b-5 states that

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

Thus, once Noack and Stifel began speaking, they had a duty to speak truthfully and not omit material facts.

Defendants argue that the claims in paragraphs 8, 105-111, 125, 132, 134, 142, and 146 must be dismissed as a matter of law because the SEC alleges no duty to speak on the part of defendants. This argument is rejected in view of other paragraphs in the Complaint that are based on the defendants' duty to speak the whole truth. For instance, in paragraph 8 of the Complaint the SEC charges that defendants "did not disclose that the portfolio in the first transaction performed poorly from the outset, with a number of the credits suffering downgrades within weeks of closing." Paragraph 108 contains similar omissions. Those alleged omissions could be deemed necessary to complete Noack's comments in paragraphs 83 and 97 about prior investments being on course and that future investments would slow if there were hiccups. Likewise, in paragraph 106 the SEC asserts that "Stifel and Noack did not disclose to each of the School Districts that they could lose their entire investment if only a fraction of the portfolio defaulted," which could be necessary in conjunction with statements asserted in paragraphs 75 and 79 regarding how many defaults would be needed before a loss of principal occurred.

However, the matching of omissions to statements that would be misleading without the omitted information is not clear.[3] Under Rule 9(b) the responsibility for pairing an omission with a statement that otherwise is misleading is plaintiff's, not this court's or defendants. Without a connection between an asserted omission and a statement creating a duty to speak the complete truth, the allegations of omissions fail to meet the

---

[3]Although a couple alleged omissions are paired with affirmative statements (*see* Doc. 1 ¶¶ 97, 98, 146, 147), for the most part they are not.

26

requirements of Rule 9(b) that fraud be pled with particularity.  Thus, the motions to dismiss and to strike will be granted as to these allegations, though the SEC will be given leave to replead.

CONCLUSION

Therefore,

IT IS ORDERED that defendants' motions to dismiss or strike (Docs. 15, 16) are granted in part and denied in part as set forth above.

IT IS ORDERED that defendants' motions for more definite statement (Docs. 15, 16) are denied as moot.

IT IS FURTHER ORDERED that the SEC may replead the dismissed or struck allegations to address the problems discussed above by filing an amended complaint within twenty-one days.  If no amended complaint is filed, the case will proceed on the original Complaint minus those paragraphs.

Dated at Milwaukee, Wisconsin, this 14th day of September, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE