UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

STIFEL NICOLAUS & COMPANY,
INCORPORATED and DAVID W. NOACK

Defendants.

Case No. 11-CV-755

Hon. Charles N. Clevert, Jr.

**FINAL JUDGMENT AS TO DEFENDANTS STIFEL NICOLAUS & COMPANY, INCORPORATED AND DAVID W. NOACK**

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Stifel Nicolaus and Company, Inc. ("Defendant Stifel" or "Stifel") and Defendant David W. Noack ("Defendant Noack" or "Noack") are permanently restrained and enjoined from violating, directly or indirectly, Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(2)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary to make the statements, in light of the circumstances at the time, not misleading.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendants' officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendants Stifel and Noack are permanently restrained and enjoined from violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

## III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendants Stifel and Noack are jointly and severally liable for disgorgement of $1,660,000, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $840,000.  Defendant Stifel is liable for a civil penalty in the amount of $22,000,000 pursuant to Section 20(d) of the Securities Act.  Defendant Noack is liable for a civil penalty in the amount of $100,000 pursuant to Section 20(d) of the Securities Act.

Defendants shall satisfy this obligation within 14 days after entry of this Final Judgment,

2

as follows:

(i)     Defendants Stifel and Noack, jointly and severally, shall pay $1,660,000, representing disgorgement ordered in this matter, to the five Wisconsin school districts that invested in the instruments at issue in this case (the "School Districts").

(ii)    Defendants Stifel and Noack, jointly and severally, shall pay $840,000, representing prejudgment interest ordered in this matter, to the Commission.

(iii)   Defendant Stifel, shall satisfy its civil penalty obligation by:

    a.  Paying $11,160,000 to the Commission;

    b.  Paying $10,840,000 to the School Districts.

(iv)    Defendant Noack shall satisfy his civil penalty obligation by paying $100,000 to the Commission.

(v)     The combined $12,500,000 in payments to the School Districts ($1,660,000 disgorgement plus $10,840,000 of Stifel's civil penalty) shall be paid to the School Districts as follows:

    a.  $3,769,824.34 to and for the benefit of the School District of West-Allis West Milwaukee;

    b.  $2,492,746.74 to and for the benefit of Kenosha School District No. 1;

    c.  $5,277,404.03 to and for the benefit of the School District of Waukesha;

    d.  $402,593.94 to the Kimberly Area School District; and

    e.  $557,430.96 to the School District of Whitefish Bay.

The remaining disgorgement, prejudgment interest and civil penalties shall be paid directly to the Commission. These payments may be transmitted electronically to the

Commission, which will provide detailed ACH transfer/Fedwire instructions upon request to the Defendants.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; the Defendant's name as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendants relinquish all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendants.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 14 days following entry of this Final Judgment.  Payment shall be deemed made on the date it is received by the Commission.  Defendants shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.  The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund

4

is created for the distribution of civil penalties and disgorgement referenced in Section III(i) and (iii) above.   administration of any distribution of the Fund.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendants shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendants' payment of disgorgement in this action, argue that they are entitled to, nor shall they further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendants' payments of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendants shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against one or both of the Defendants by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

The Commission's staff shall engage a tax administrator for the Fair Fund as the Fair Fund constitutes a qualified settlement fund under Section 468B(g) of the Internal Revenue Code, 26 U.S.C. § 468B(g), and related regulations, 26 C.F.R. §§ 1.468B-1 through B-5. Taxes, if any, and related administrative expenses shall be paid from the Fair Fund.

Within 45 days after Defendants complete the disbursement of all amounts payable to the

School Districts, Defendants shall submit to the Commission's staff a final accounting and certification of the disposition of the Fair Fund, which final accounting and certification shall be in a format to be provided by the Commission's staff. The final accounting and certification shall include, but not be limited to: (1) the amount paid to each payee; (2) the date of each payment; (3) the check number or other identifier of money transferred; (4) the amount of any returned payment and the date received; (5) a description of any effort to locate a prospective payee whose payment was returned or to whom payment was not made for any reason; and (6) an affirmation that Defendants have made payments from the Fair Fund to the School Districts in accordance with the calculation approved by the Commission's staff.  Defendants shall submit proof and supporting document of such payment (whether in the form of electronic payments or cancelled checks) in a form acceptable to the Commission's staff under a cover letter that identifies Defendants and the file number of these proceedings to Anne C. McKinley, Assistant Regional Director, Chicago Regional Office. Defendants shall provide any and all supporting documentation for the accounting and certification to the Commission upon its request and shall cooperate with any additional requests by the Commission's staff in connection with the accounting and certification.

After Defendants have submitted the final accounting to the Commission's staff, the Commission's staff shall submit the final accounting to the Court for approval and shall request Court approval to send any undistributed amount to the United States Treasury.

IV.

Defendant Stifel consents to the entry of this Final Judgment and agrees as follows:

1.      Defendant Stifel acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant Stifel and

6

over the subject matter of this action.

2.  Defendant Stifel hereby admits solely the facts contained in Section VI of this Final Judgment (the "Admitted Facts"), and consents to the entry of this Final Judgment, which, among other things:

(a)  permanently restrains and enjoins Defendant Stifel from violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act");

(b)  orders Defendant Stifel to pay disgorgement, joint and severally with Defendant David W. Noack, in the amount of $1,660,000, plus prejudgment interest thereon in the amount of $840,000; and

(c)  orders Defendant Stifel to pay a civil penalty in the amount of $22,000,000 under Section 20(d) of the Securities Act.

3.  Defendant Stifel acknowledges that the civil penalty paid pursuant to the Final Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant Stifel agrees that it shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant Stifel's payment of disgorgement in this action, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant Stifel's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant Stifel agrees that it shall, within 30 days after entry of a final order granting the

7

Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant Stifel by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4. Defendant Stifel agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant Stifel pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant Stifel further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant Stifel pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

5. Defendant Stifel waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6. Defendant Stifel waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

7. Defendant Stifel enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant

8

Stifel to enter into this Consent.

8.    Defendant Stifel will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.    Defendant Stifel waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant Stifel of its terms and conditions.  Defendant Stifel further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant Stifel has received and read a copy of the Final Judgment.

10.    Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant Stifel in this civil proceeding.  Defendant Stifel acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability.  Defendant Stifel waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.  Defendant Stifel further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in

9

an administrative proceeding.  In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant Stifel understands that it shall not be permitted to contest the Admitted Facts.

11.     Defendant Stifel understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings."  As part of Defendant Stifel's agreement to comply with the terms of Section 202.5(e), Defendant Stifel: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant Stifel does not admit the Admitted Facts; (iii) for the allegations in the complaint not included in the Admitted Facts, will not make or permit to be made any public statement to the effect that Defendant Stifel does not admit those allegations of the complaint, or that this Consent contains no admission of those allegations, without also stating that Defendant Stifel does not deny those allegations; and (iv) upon the filing of this Consent, Defendant Stifel hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint.  If Defendant Stifel breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket.  Nothing in this paragraph affects Defendant Stifel's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.     Defendant Stifel hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law

to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant Stifel to defend against this action. For these purposes, Defendant Stifel agrees that Defendant Stifel is not the prevailing party in this action since the parties have reached a good faith settlement.

13. Defendant Stifel agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

V.

Defendant Noack consents to the entry of this Final Judgment and agrees as follows:

1. Defendant Noack acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant Noack and over the subject matter of this action.

2. Defendant Noack hereby admits solely the facts contained in Section VI of this Final Judgment (the "Admitted Facts"), and consents to the entry of this Final Judgment, which, among other things:

    (a)    permanently restrains and enjoins Defendant Noack from violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act");

    (b)    orders Defendant Noack to pay disgorgement, joint and severally with Defendant Stifel Nicolaus & Company, Incorporated, in the amount of $1,660,000, plus prejudgment interest thereon in the amount of $840,000; and

    (c)    orders Defendant Noack to pay a civil penalty in the amount of $100,000

11

under Section 20(d) of the Securities Act.

3. Defendant Noack acknowledges that the civil penalty paid pursuant to the Final Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the civil penalty shall be treated as a penalty paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant Noack agrees that he shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant Noack's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant Noack's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant Noack agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant Noack by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4. Defendant Noack agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant Noack pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part

12

thereof are added to a distribution fund or otherwise used for the benefit of investors.  Defendant

Noack further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with

regard to any federal, state, or local tax for any penalty amounts that Defendant Noack pays

pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof

are added to a distribution fund or otherwise used for the benefit of investors.

5.      Defendant Noack waives the entry of findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6.      Defendant Noack waives the right, if any, to a jury trial and to appeal from the

entry of the Final Judgment.

7.      Defendant Noack enters into this Consent voluntarily and represents that no

threats, offers, promises, or inducements of any kind have been made by the Commission or any

member, officer, employee, agent, or representative of the Commission to induce Defendant

Noack to enter into this Consent.

8.      Defendant Noack will not oppose the enforcement of the Final Judgment on the

ground, if any exists, that he fails to comply with Rule 65(d) of the Federal Rules of Civil

Procedure, and hereby waives any objection based thereon.

9.      Defendant Noack waives service of the Final Judgment and agrees that entry of

the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to

Defendant Noack of its terms and conditions.  Defendant Noack further agrees to provide

counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of

the Court, with an affidavit or declaration stating that Defendant Noack has received and read a

copy of the Final Judgment.

10.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims

13

asserted against Defendant Noack in this civil proceeding.  Defendant Noack acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability.  Defendant Noack waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant Noack further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations.  Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding.  In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant Noack understands that he shall not be permitted to contest the Admitted Facts.

11.	Defendant Noack understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings."  As part of Defendant Noack's agreement to comply with the terms of Section 202.5(e), Defendant Noack: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant Noack does not

14

admit the Admitted Facts; (iii) for the allegations in the complaint not included in the Admitted Facts, will not make or permit to be made any public statement to the effect that Defendant Noack does not admit those allegations of the complaint, or that this Consent contains no admission of those allegations, without also stating that Defendant Noack does not deny those allegations; and (iv) upon the filing of this Consent, Defendant Noack hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant Noack breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant Noack's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12. Defendant Noack hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant Noack to defend against this action. For these purposes, Defendant Noack agrees that Defendant Noack is not the prevailing party in this action since the parties have reached a good faith settlement.

13. Defendant Noack agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

VI.

Defendant Stifel and Defendant Noack admit the following facts (*see* ¶¶ 1 – 76):

**Overview**

15

1. Stifel, Nicolaus & Co., Inc. ("Stifel") is a registered broker-dealer. In 2006, David Noack was a Senior Vice President at Stifel and was head of Stifel's Milwaukee office.

2. In 2006, Stifel and Noack recommended that five School Districts in eastern Wisconsin invest in synthetic collateralized debt obligations ("CDOs") structured and sold via prospectus by RBC Capital Markets LLC ("RBC"). The School Districts are: School District of West Allis-West Milwaukee ("West Allis-West Milwaukee"), Kenosha School District No. 1 ("Kenosha"), School District of Waukesha ("Waukesha"), Kimberly Area School District ("Kimberly"), and School District of Whitefish Bay ("Whitefish Bay").

3. In connection with their recommendations, Stifel and Noack made certain material misstatements to the School Districts that overstated the safety and downplayed the risks of investing in CDOs.

4. Stifel and Noack also failed to disclose certain material facts to the School Districts about the investments.

5. Stifel and Noack understood the investment history and risk tolerance of the School Districts, including that the School Districts had a history of making low-risk investments such as U.S. Treasuries, certificates of deposit, highly rated commercial paper, and comparable low-risk investments, and had no prior experience investing in CDOs or similar investments. They also understood that safety of principal was an important objective of the School Districts.

6. Stifel and Noack recommended the CDO investments which, as structured, were leveraged and had the potential to – and ultimately did – suffer a total loss.

7. Stifel and Noack did not independently perform any meaningful suitability analysis with respect to the CDO investments they recommended to the School Districts.

16

8.      Stifel and Noack recommended that the School Districts invest their own funds – plus funds borrowed by specially-created trusts – for a total investment of $200 million.  The School Districts did so.

9.      The investments failed.  The School Districts suffered a complete loss of their cash investment of $47.3 million.

**The GOAL Program**

10.     In addition to pensions, the School Districts agreed to provide their employees other post-employment benefits, such as healthcare and life insurance.  The commitments to provide Other Post-Employment Benefits are known in the industry as "OPEB" liabilities.

11.     Prior to 2005, the School Districts had not funded these OPEB liabilities.  At the beginning of 2006, the five School Districts had combined unfunded OPEB liabilities in excess of $600 million.

12.     The School Districts consulted with Stifel and Noack to assist in exploring structures and investments to fund a portion of their OPEB liabilities.

13.     In late 2005 to early 2006, attempting to provide a solution to help the School Districts fund a portion of OPEB liabilities, Stifel and Noack created the Government OPEB Asset and Liability Program, also called the "GOAL Program."  The GOAL Program envisioned that the School Districts would make investments through specially created trusts ("OPEB Trusts") to generate funds to pay OPEB liabilities.

14.     The basic premise of the GOAL Program was for the OPEB Trusts to invest in securities rated AA- with cash provided by the School Districts along with borrowed funds.  The difference between the yield on the investments and the cost of the borrowed funds would provide income that would partially fund OPEB liabilities.

17

15.    As part of the GOAL Program, Stifel and Noack recommended that the School Districts, through their OPEB Trusts, invest in credit-linked notes rated AA- by Standard and Poor's.  The credit-linked notes were structured and sold by RBC pursuant to a written prospectus.  The credit-linked notes were tied to the performance of synthetic CDOs, comprised of a portfolio of 100 or more credit default swaps referencing corporate bond obligations.  The CDOs essentially transferred the risk of default on the bonds to the OPEB Trusts, and did so through the synthetic CDO exposure.

16.    The five School Districts ultimately participated in three deals, called Tribune 30, Sentinel 1, and Sentinel 2.  There were three investments in June 2006, September 2006, and December 2006, totaling $200 million:

| **Product** | **Closing Date** | **Investors** | **Amount** |
|---|---|---|---|
| Tribune Limited Series 30 Floating Rate Credit Linked Secured Notes due 2013 ("Tribune 30") | June 27, 2006 | West Allis-West Milwaukee | $25 million |
| Sentinel Limited Series 1 Floating Rate Credit Linked Secured Notes due 2013 ("Sentinel 1") | September 29, 2006 | West Allis-West Milwaukee Kenosha Waukesha | $60 million |
| Sentinel Limited Series 2 Floating Rate Credit Linked Secured Notes due 2013 ("Sentinel 2") | December 21, 2006 | West Allis-West Milwaukee Kenosha Waukesha Kimberly Whitefish Bay | $115 million |

17.    The investments were funded by contributions to the OPEB Trusts by the School Districts and borrowings by the OPEB Trusts.  In the aggregate, the School Districts contributed

18

$37.3 million to their respective OPEB Trusts, much of which came from School District public debt offerings arranged by Stifel and Noack.  The OPEB Trusts also borrowed $162.7 million from Depfa Bank to cover the rest of the $200 million investment.  The Depfa notes were collateralized by the OPEB Trusts' assets (specifically, the credit-linked note investments) and by the moral obligation of the School Districts to fund any collateral shortfalls that may arise due to a decline in the value of the credit-linked notes.

### The Credit-Linked Notes

18.        A CDO is a type of asset-backed security collateralized by a pool of assets.  In some structures, investors can buy different levels of a CDO – the slices are called "tranches" – and thus assume different levels of risk.  When a CDO is "tranched," different tranches have different levels of risk, and different returns.

19.        A synthetic CDO is comprised of a portfolio of derivative instruments such as credit default swaps.  A credit default swap is essentially a contract in which one party insures the other party against losses on a bond or other reference asset due to a default or other credit event.  A credit default swap is basically a means to transfer the risk of default from one party to another, in exchange for premium payments.

20.        The success or failure of an investment in a synthetic CDO depends in part on the performance of the individual credits in the portfolio.  The default risk is tied to the number of the defaults, and the magnitude of each default, by the corporate credits in the portfolio.  The magnitude of each default in the portfolio depends on the so-called "recovery rate," that is, the percentage that is not lost when there is a default (the recovery rate is basically the inverse of the loss rate).  For example, in a portfolio of 100 credits, if 10 companies default, with an average recovery rate of 50%, the portfolio would suffer cumulative losses of 5% (*i.e.,* 10 x 0.50%).

19

21. The amount of cumulative losses in the portfolio determines when the investor in a synthetic CDO begins to lose money, and when the investor has suffered a complete loss. Adding the losses from each default leads to the cumulative losses in the portfolio, and the cumulative losses determine whether the investor has suffered a loss.

22. When losses reach the "attachment" point, the investor begins to lose principal. When losses reach the "detachment" point, the investor has lost its entire investment. For example, if an investment had an attachment point of 4.50% and a detachment point of 5.50%, the investor would begin to lose principal if cumulative losses in the portfolio reached 4.50%, and would lose its entire principal if cumulative losses in the portfolio reached 5.50%.

23. The School Districts' CDO investments were insulated from the initial losses in the underlying portfolio of credit default swaps up to the attachment point. Beyond that point, the School Districts would begin to lose money. They would suffer a total loss if losses reached the detachment point. In each deal, there was a 1% difference between losing nothing and losing everything.

24. In the three deals with the School Districts, the attachment points were approximately 3.95%, 4.50%, and 4.60% of the underlying portfolio, respectively, and the detachment points were approximately 4.95%, 5.50%, and 5.60% of the underlying portfolio, respectively. So, in the first deal, the investment would not lose principal unless cumulative losses in the portfolio reached 3.95% of the underlying portfolio, but the investment would suffer a complete loss if cumulative losses in the portfolio reached 4.95%.

25. There were 105 credits in the first deal, 100 credits in the second deal, and 140 credits in the third deal. The credits were equally weighted.

20

26.     The CDO portfolios were comprised of credit default swaps referencing corporate bonds with a variety of credit ratings.  The CDO portfolios included credit default swaps referencing corporate bonds with ratings ranging from AAA to BBB- in the first two deals, and from AAA to B+ in the third deal.  As a whole, each credit-linked note was rated AA- by Standard and Poor's.

**The Risks of the CDO Investments and the GOAL Program**

27.     Because Stifel's GOAL Program was premised on borrowing the majority of the investment funds from Depfa Bank, it was structured to generate a higher yield than was available through other fixed income investments rated AA- to provide the School Districts with a return that exceeded the program's borrowing costs and that was sufficient to provide funding for a portion of the School Districts' OPEB liabilities.  The structure of the CDO investments provided a higher potential return but also increased the risk that the School Districts could suffer a substantial or total loss of principal compared to a direct investment in a portfolio of corporate bonds.  If the School Districts had purchased a portfolio of bonds, portfolio losses of 5% to 6% would have led to losses by the School Districts of 5% to 6%, while comparable losses in the CDO portfolios would have resulted in significantly larger losses to the School Districts.  Because a portfolio of AA- corporate bonds would not have provided the School Districts with sufficient returns above their borrowing costs to assist in funding a portion of OPEB liabilities, such an investment was not selected for use in the GOAL Program.

28.     The use of leverage from the Depfa Bank loans also increased the risk/reward potential of the investments, and was the only way Stifel's GOAL Program could achieve the necessary return using AA- investments.  The borrowed funds from Depfa Bank increased the potential for larger returns – or larger losses – depending on the performance of the investments.

21

29.     The GOAL Program also posed mark-to-market risk.  Because the School Districts assumed a "moral obligation" to contribute additional funds to their OPEB Trusts if the collateralization of the Depfa notes fell below a specified threshold, such as in the case of a decline in the value of the CDO investments below a certain level, the School Districts faced potential financial consequences if they failed to contribute additional collateral under such circumstances.  These included the potential liquidation of the CDO investments by Depfa Bank, which would result in a partial or complete loss for the School Districts.

30.     The investments exposed the School Districts to the credit risk of the underlying credits in the portfolios.

31.     As part of the search process for appropriate assets for the program, Stifel issued a Request for Proposal ("RFP") to various investment banks seeking bids on investments that met certain parameters, including a minimum rating of AA-.  Stifel indicated in the RFP that the School Districts had "maximum yield/spread objectives" for the investment.  The GOAL Program required a yield sufficiently in excess of the School Districts' borrowing costs to generate income to fund a portion of OPEB liabilities.

**The Lack of Familiarity with CDOs**

32.     In 2006, typical purchasers of CDOs included hedge funds, insurance companies, investment banks, and other highly sophisticated financial institutions.  The School Districts had no prior experience investing in CDOs, in instruments tied to CDOs, or other structured investments.

33.     Before late 2005 or early 2006, Noack had no prior experience with CDOs, and he had little or no understanding of how CDOs functioned.  He had never sold a product tied to

22

CDOs to any customer. Certain Stifel senior executives were aware of Noack's lack of experience with CDOs.

34. Nevertheless, Stifel allowed Noack to be its spokesperson and, in many cases, the sole Stifel representative when discussing the CDO investments and the GOAL Program with the School Districts.

### Stifel's and Noack's Receipt of Information about the Risks of the CDO Investments

35. After the first investment in June 2006, Stifel and Noack arranged a meeting between representatives of the School Districts and potential CDO providers, inviting a number of firms to attend and present information about their CDO products at a meeting with the School Districts on July 26, 2006. Both RBC and another firm presented their CDO products to the School Districts at the meeting, although several other firms invited declined the invitation to present. In declining, one firm explained that it had sold such products only to "qualified institutional buyers." Another potential CDO provider informed Stifel and Noack that it was uncomfortable with the large amount of leverage in the GOAL Program.

36. On July 24, 2006, an employee at Stifel's Alternative Spread Products desk in Baltimore sent an internal email to a Stifel senior executive noting that a potential CDO provider "had many of the same concerns that we had voiced with respect to the [OPEB] structure. Their feeling is that the structure incorporates too much leverage for them to be comfortable."

37. In early August 2006, only a few weeks after the first transaction closed, RBC notified Stifel and Noack about multiple downgrades in the portfolio underlying the first investment. RBC wrote: "10 names downgraded (model assumes neg watch names downgraded once), 4 by more than one notch. (One name upgraded). Unusual number in a short period of

23

time, has created some risk that note goes on negative watch. . . want to be proactive in warning Stifel of possibility, especially given the concern [a Stifel senior executive] expressed last week about the trade structured for most yield for rating (with not a lot of cushion)."

38.     On August 4, 2006, Noack asked RBC "why [the portfolio manager] picked these credits to begin with.  Seems like too many credits for increase spread."  Noack then asked the RBC representative: "Could we not unwind and buy $25MM more this time with more conservative portfolio?" "The program," Noack added, was "1000 times bigger than the first trade."

39.     Following that exchange, Stifel and Noack did not change the structure of the GOAL Program.  Stifel and Noack spoke to RBC and were informed that the independent asset manager responsible for selecting and managing the portfolio had traded out of the problem credits and that there was sector and industry diversity within the portfolio.  Stifel and Noack did not perform additional due diligence on the underlying portfolios of the second and third transactions, or monitor the credit selection process for those transactions, beyond what they were informed by RBC about the presence of an independent asset manager and its role in monitoring credits, and the existence of industry diversification in the portfolio.

40.     Following these events, Stifel and Noack continued to recommend the GOAL Program to the School Districts.

41.     In the third deal, the portfolio manager requested the flexibility to include up to 10% non-investment-grade credits in the portfolio.  Stifel and Noack agreed, with the understanding the CDO investment's rating would remain AA-.  However, Stifel and Noack did not discuss this portfolio modification with the School Districts.

24

42.     By December 2007, the CDO investments had declined in value to below 101% of the balance on the Depfa Bank loans, triggering the moral obligation of the School Districts.  West Allis-West Milwaukee contributed an additional $10 million in 2008 to fund its collateral shortfall pursuant to its moral obligation.

43.     The School Districts ultimately suffered a complete loss of their $47.3 million cash investment on all three investments, including the $10 million West Allis-West Milwaukee contributed in 2008.

**Inaccurate Statements and Omissions by Stifel and Noack**

44.     In 2006, Stifel and Noack made a series of presentations to the School Districts about investing in CDOs.  The presentations took place during School Board meetings, School Board committee meetings, and in many informal conversations.  In certain of these meetings, Stifel and Noack made misstatements to the School Districts about the safety of the CDO investments.

45.     Stifel and Noack told the School Districts that the investments were "conservative" and involved "very little risk."

46.     In describing the CDO investments to the School Districts, Noack made certain comparisons to U.S. Treasuries.  While Noack believes he intended to compare only the mark-to-market risks, several School District representatives have said they understood Noack's statements to mean that the CDO investments carried similar risks as U.S. Treasuries.

25

47.     Noack did not disclose to each of the School Districts that potential CDO providers told Stifel that they had declined to participate in the GOAL Program due to its structure or the nature of the participating investors.

48.     Noack made a series of statements to the School Districts about the number of defaults that it would take to lose money.

49.     During a recorded meeting on November 15, 2006, Noack told the School Board of Whitefish Bay: "And it gives added comfort that, you know, it takes 15 defaults for us to start losing money and we have somebody [the independent asset manager] watching over every company, every day, for seven years, and if it starts to look like it's going that way, they get out of it. The only way – the real – you need 15 Enrons. You need something to happen that big overnight."

50.     During the same meeting, Noack repeated the point: "You need 15 of those to hit." Noack added, "AA is, 15 percent of these companies default, I start losing money. Okay? So, it's the number of defaults it takes in order to you to start losing principal that the rating agencies give the different ratings. Okay? And AA is about 15. You know, that 15 of these companies would have to have – go under." He added: "And what Standard and Poor's does is say, okay, when's the last time 15 of these companies went under? It's way back. Therefore, you're at AA. It's the same credit risk that you're taking if somebody bought your bonds. Is Whitefish Bay going to go under? Okay?"

51.     Noack also told other School Districts that it would take 15 Enrons for the School Districts to start to lose money.

26

52. These representations were false. The investments could, and in fact did, suffer losses with fewer than 15 defaults.

53. Noack told one School District that it would take 20 defaults to start losing money. Noack made that statement during a recorded School Board meeting. During a recorded meeting on November 27, 2006, Noack made the following statement to Waukesha: "[T]he odds of, again, it takes twenty out of these hundred companies to default before it gets to your AA level."

54. That statement was false. For the third deal, assuming a 40% recovery rate (the assumption used in RBC and Stifel marketing materials), the School Districts stood to lose money in the third deal if eleven out of the 140 companies in the portfolio defaulted and stood to lose their entire investment if thirteen companies defaulted. In fact, the third deal suffered a complete loss after twelve companies defaulted.

55. In August 2006, before the second deal, Noack told one School District that 30 of the 105 companies in the portfolio would have to default before the School Districts would begin to lose principal. That statement was false. For the second deal, assuming a 40% recovery rate, the School Districts stood to lose money after eight out of the one hundred companies in the portfolio defaulted and stood to lose their entire investment if ten companies defaulted. In fact, the second deal suffered a complete loss after ten companies defaulted.

56. Assuming a 40% recovery rate, the School Districts could have lost money in each deal after fewer than 15 defaults.

57. Noack told one School District that the economy would have to be worse than the Great Depression for the investments not to perform. Noack told another School District that

27

there had not been a default since the Great Depression. During a recorded meeting with Whitefish Bay on November 15, 2006, Noack said: "You'd have to go way back to a major depression – to, to have a default [on a AA rated investment]."

58. Those representations were false. There was a risk that the investments would fail, even without an economic calamity of the magnitude of the Great Depression.

59. Noack told the School Districts that the portfolio for the third deal would include only investment-grade companies. During a meeting of the School Board of Waukesha on or about November 27, 2006, which was videotaped, Noack stated: "[A]gain, we're only investing in higher grade companies. If you look at the balance sheets of investment grade companies in the world today, which is 805, they're doing better than ever." During a recorded meeting with Whitefish Bay on November 15, 2006, Noack said that "the companies that this black box takes exposure to is all investment-grade companies," and that "they're already focusing on higher, higher-rated credits."

60. Those representations were false. The third transaction included credits in the portfolio that were not investment grade.

61. Noack did not properly disclose the initial performance of the first investment. On August 14, 2006, in response to a question at a West Allis-West Milwaukee School Board meeting held to discuss an additional investment in the GOAL Program, Noack represented that the investment was "on course." Noack based this statement on the fact that the portfolio manager had swapped out several of the downgraded credits, but he did not disclose to the School Districts the existence of those downgrades.

28

62. Noack made similar statements to Kenosha, Waukesha and Whitefish Bay. For example, during a recorded meeting with Whitefish Bay on November 15, 2006, Noack stated: "So, we are phasing it in and if there is a hiccup in one of the investments, we would slow down, Okay?"

63. Those representations were misleading, and omitted information necessary to make them not misleading. Stifel and Noack were aware that there were ten downgrades within the CDO portfolio within six weeks of the close of the first transaction, and that the downgraded credits had been swapped out by the independent asset manager to avoid the possibility of the CDO investment being placed on negative ratings watch. Stifel and Noack asked RBC: "Could we not unwind and buy $25MM more this time with more conservative portfolio?"

64. Stifel and Noack recommended the second and third deals to the School Districts, without disclosing the poor performance of the first deal.

65. Noack represented to West Allis-West Milwaukee on or about April 25, 2006 that that moral obligation had "no teeth," referring to the fact that Depfa could not go after the School Districts' assets. While it did not impose any legal obligation on the School Districts to pay, the moral obligation posed a risk of collateral consequences for the credit ratings of the School Districts.

66. Noack acted on behalf of Stifel when he made each of these statements or omissions to the School Districts. All of the statements and omissions took place while Noack was an employee of Stifel in 2006.

29

**Failure to Adequately Assess the Appropriateness of the Investments**

67.     Stifel and Noack recommended investments to the School Districts without adequately investigating the risks or assessing the appropriateness of the investments in light of the School Districts' conservative investment objectives.

68.     In 2006, Stifel and Noack were not aware of any school district – anywhere in the country – ever investing in CDOs.

69.     Stifel and Noack did not perform any independent suitability analysis with respect to the CDO investments they recommended to the School Districts. Stifel and Noack relied primarily on the AA- rating assigned by Standard & Poor's and its general understanding of the investments without conducting a more detailed evaluation of the investments and the specific credits in the portfolio.

70.     Noack had no experience with CDO investments when Stifel and Noack recommended them to the School Districts. Although Stifel employed individuals with expertise in structured products, Stifel did not utilize them to evaluate the CDOs or involve them in meetings with the School Districts.

71.     Apart from information they received from RBC about the general structure and terms of the investments, the general composition of the portfolios, and the role of the independent asset manager, Stifel and Noack performed little or no independent due diligence on the CDO investments they recommended to the School Districts. They did not perform any independent default or sensitivity analyses, stress testing, or risk analyses. They did not calculate the probability or likelihood of the School Districts suffering a loss. They also did not investigate the underlying portfolios of credits or CDS spreads that stood to determine the CDOs' performance. On June 7, 2006 – twenty days before closing of the first deal – a Stifel senior

30

executive stated to Noack: "We have done very little due diligence on this structure and would to [sic] need to know a lot more" before Stifel could act as principal for the transaction.

72.     In August 2006, between the first and second investments, Noack updated certain Stifel senior executives on downgrades in the portfolio underlying the first investment. Noack stated that "I originally thought the Baltimore guys would have reviewed the portfolio, but they did not want the responsibility. Obviously, the [third party] Manager has this role. But my belief is that Stifel still needs to look at the credits for our own diligence." Stifel did not perform due diligence on the credits in the portfolios in subsequent deals.

73.     In the second and third investments, RBC sought a representation from Stifel that the investments were, in fact, suitable for the School Districts. Stifel and Noack informed RBC that "[s]ynthetic collateralized debt obligations carrying a rating of at least 'AA-' . . . have been deemed by the Agent (based in part upon representations made by the Districts and the Trusts in letters to the Agent and the issuer of the Securities and upon the legal opinions of the Districts' counsel) to be a suitable investment for the Trusts . . . ." Stifel also stated to RBC that it had "not undertaken any evaluation or independent investigation of the Securities or the financial assets that secure them."

74.     On September 15, 2006, Noack sent a memorandum to certain Stifel senior executives that attached risk factors from the draft prospectuses for the second transaction. The risk factors stated that the investment was "only suitable" for investors who are "banks, investment banks, pension funds, insurance companies securities firms, investment institutions, central governments, large international or supranational organisations or other entities, including *inter alia* treasuries and finance companies or large enterprises which are active on a

31

regular and professional basis in the financial markets for their own account." The School Districts were not "central governments." Before closing the second deal, during a comment process involving Stifel and RBC, the prospectus supplement for the second deal was amended to include "government agencies" and "government instrumentalities." The prospectus supplement for the third deal included that same amended disclosure.

## Stifel's and Noack's Conduct

75. Stifel and Noack acted negligently by making material misstatements and omissions to the School Districts and by failing adequately to investigate the appropriateness of the CDO investments.

76. By engaging in the acts and omissions described above, Stifel and Noack violated the federal securities laws.

32

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the allegations in the Admitted Facts are true and admitted by Defendant Noack, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant Noack under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant Noack of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment, including administration of any distribution of the Fair Fund.

Dated at Milwaukee, Wisconsin, on this 6th day of December 2016.

/s/ C. N. Clevert, Jr.
C. N. Clevert, Jr.
United States District Judge

33